[Cite as *In re A.W.*, 2014-Ohio-3188.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

IN THE MATTER OF:                 :

                           CASE NO. CA2014-03-005

       A.W.                       :

                           O P I N I O N

                :          7/21/2014

                :

                :

APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 12AND0012

Susan Wollscheid, P.O. Box 841, Washington C.H., Ohio 43160, Guardian Ad Litem

Kristina M. Oesterle, P.O. Box 314, Washington C.H., Ohio 43160, for appellant

Jess C. Weade, Fayette County Prosecuting Attorney, James B. Roach, 110 East Court Street, Washington C.H., Ohio 43160, for appellee

**S. POWELL, P.J.**

{¶ 1} Appellant, the biological mother of A.W., appeals a decision of the Fayette County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter to appellee, the Fayette County Department of Job and Family Services, Children Services Division (FCDJFS). For the reasons outlined below, we affirm.

{¶ 2} On January 5, 2012, FCDJFS filed a complaint alleging A.W., appellant's then

one-year-old daughter, was a neglected and dependent child. At the time the complaint was filed, appellant, who suffers from depression and severe anxiety, was in jail facing charges of domestic violence against her then live-in boyfriend, R.W., the father listed on A.W.'s birth certificate. After holding a hearing on the matter, the juvenile court granted temporary custody of A.W. to FCDJFS. Thereafter, on March 15, 2012, the juvenile court adjudicated A.W. a neglected and dependent child and ordered her to remain in the temporary custody of FCDJFS. A paternity test later revealed R.W. was not A.W.'s father. To date, the identity of A.W.'s father remains unknown.

{¶ 3} After FCDJFS was granted temporary custody of A.W., the juvenile court adopted a case plan that instructed appellant to complete a parenting course, receive substance abuse and mental health treatment, submit to random drug testing, and show an ability to meet the basic needs of herself and her daughter. By September 11, 2012, the parties agreed that appellant had substantially completed the case plan. As a result, the juvenile court returned legal custody of A.W. to appellant and granted protective supervision of the child to FCDJFS.

{¶ 4} Approximately three weeks later, on October 4, 2012, FCDJFS filed a new complaint again alleging A.W. was again a neglected and dependent child. The new complaint was based on allegations that when FCDJFS made an unannounced visit to her home on the morning of October 3, 2012, appellant failed to answer the door for approximately 15 minutes. During this time, FCDJFS reported that A.W. attempted to open the door and could be heard crying inside. Once appellant answered the door, appellant appeared under the influence and exhibited dilated eyes, stuttering and slurred speech, and contradicted herself. Appellant later admitted to mixing the drugs Xanax and Suboxone, a medication prescribed to combat her prior heroin addiction, contrary to her doctor's orders. A drug screen also confirmed appellant's use of Xanax in conjunction with Suboxone. As a

result of these new allegations, the juvenile court once again granted temporary custody of A.W. to FCDJFS.

{¶ 5} On June 18, 2013, after the parties agreed that appellant had once more shown herself capable of caring for her daughter, the juvenile court returned legal custody of A.W. to appellant and granted FCDJFS protective supervision of the child. As part of the juvenile court's judgment entry, the juvenile court stated the following:

> There is a protection order in place whereby [R.W.] is not allowed to be around [appellant]. [R.W.] was recently charged with OVI and was found to have a firearm in his car. That incident occurred later in the day following his being at [appellant's] home.

The juvenile court also stated as part of its judgment entry:

> The [FCDJFS] has no concerns about custody being returned to [appellant], but requests they be awarded protective supervision. They have concerns about the relationships that [appellant] may be keeping.

{¶ 6} Approximately three and one-half months later, on October 2, 2013, the Washington Courthouse Police Department received an anonymous phone call from an individual expressing their concerns about A.W. and appellant being at R.W.'s home. Deciding to conduct a welfare check at R.W.'s residence, police repeatedly knocked on the door for approximately five minutes before R.W. answered. Once R.W. answered the door, A.W. could be seen sitting inside. When asked about appellant's whereabouts, R.W. reported that appellant had gone to the grocery store. Appellant returned shortly thereafter, also claiming to have been at the grocery store.[1] Appellant, however, appeared unsteady on her feet, had dilated pupils, and exhibited slurred speech.

{¶ 7} Believing appellant was under the influence of drugs or alcohol, the officers

---

1. Appellant later claimed that she was actually sitting in the back seat of a car parked behind R.W.'s house waiting to go to Taco Bell when the police arrived.

- 3 -

then administered a field sobriety test to appellant, which she failed. Appellant also refused to submit to a breathalyzer test or provide a urine sample. Due to her apparent intoxication, A.W. was then removed from R.W.'s home and again placed in the temporary custody of FCDJFS. After the child was removed from her care, appellant agreed to appear at FCDJFS offices the following morning. Appellant, however, did not appear. Instead, after failing to appear at the scheduled time, appellant called FCDJFS claiming she was traveling to Gatlinburg, Tennessee with her mother and would not return for a week. Although leaving several voicemails with the agency, appellant did not return to FCDJFS until approximately two weeks later.

{¶ 8} After again receiving temporary custody of the child, on December 16, 2013, FCDJFS filed for permanent custody of A.W. A hearing on the matter was then scheduled for February 18, 2014. Following this hearing, the juvenile court issued its decision finding by clear and convincing evidence that it was in the child's best interest to grant permanent custody to FCDJFS. Appellant now appeals from the juvenile court's decision granting permanent custody of her daughter to FCDJFS, raising one assignment of error for review.

{¶ 9} THE TRIAL COURT'S DECISION TO GRANT THE FAYETTE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES PERMANENT CUSTODY OF A.W. IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE THAT GRANTING PERMANENT CUSTODY WOULD BE IN THE BEST INTEREST OF A.W.

{¶ 10} In her single assignment of error, appellant raise several issues arguing the juvenile court's decision granting permanent custody to FCDJFS was not in the child's best interest as that finding was not supported by sufficient credible evidence. Although not explicit, we construe appellant's single assignment of error as a manifest weight of the evidence challenge. In reviewing a trial court's decision in this context, "this court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility

determinations, clearly lost its way and created a manifest miscarriage of justice." *In re Mn S.(F)*, 12th Dist. Madison No. CA2013-02-004, 2013-Ohio-3086, ¶ 10, citing *In re M.Z.*, 9th Dist. Lorain No. 11 CA010104, 2012-Ohio-3194, ¶ 22.

{¶ 11} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers*, 138 Ohio App.3d 510, 520 (12th Dist.2000). Therefore, as an appellate court reviewing a decision granting permanent custody, we neither weigh the evidence, nor assess the credibility of the witnesses, but instead, determine whether there is sufficient clear and convincing evidence to support the juvenile court's decision. *In re S.D.*, 12th Dist. Butler No. CA2013-08-138, 2014-Ohio-156, ¶ 28.

{¶ 12} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. Initially, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Next, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or

where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 22. Only one of those findings must be met for the second prong of the permanent custody test to be satisfied. *In re T.D.*, 12th Dist. Preble No. CA2009-01-002, 2009-Ohio-4680, ¶ 15.

{¶ 13} In this case, the juvenile court found by clear and convincing evidence that A.W. has been in the temporary custody of FCDJFS for more than 12 months of a consecutive 22-month period. Appellant does not dispute this finding. Rather, appellant raises several issues regarding the juvenile court's finding that granting permanent custody of A.W. to FCDJFS was in the child's best interest.

{¶ 14} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a)      The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b)      The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c)      The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
>
> (d)      The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e)      Whether any of the factors in divisions (E)(7) to (11) of this

- 6 -

section apply in relation to the parents and child.

{¶ 15} With respect to R.C. 2151.414(D)(1)(a), the juvenile court found A.W. interacts well with appellant during her weekly visits, but that "[t]the child does exhibit separation anxiety with when with her mother and wants to know when she will be back with the foster family." In addition, the juvenile court found that although A.W. does have a bond with her mother, she has a "stronger bond" with her foster family. The juvenile court also found that A.W.'s foster family "does many activities with the child and the child gets along very well with the family."

{¶ 16} In consideration of R.C. 2151.414(D)(1)(b), the juvenile court found A.W.'s young age prohibited it from conducting an in camera interview regarding the child's wishes, nor were her wishes contained in the guardian ad litem's report. The guardian ad litem, however, did recommend permanent custody be granted to FCDJFS. In reaching this conclusion, the guardian ad litem noted appellant's "instability has had a significant impact upon A.W," as well as appellant's failure to receive "continued appropriate treatment for her own physical health as well as her mental health." The report also indicated A.W. repeatedly referred to her foster family's residence as "home," and that the child showed a "great deal of excitement to go there and see daddy and sissy," her foster father and foster sister.

{¶ 17} With respect to R.C. 2151.414(D)(1)(c), the juvenile court found A.W. had been in the temporary custody of FCDJFS from January 5, 2012 until September 11, 2012, again from October 4, 2012 until June 20, 2013, and finally from October 31, 2013 to the present. As noted above, it is undisputed that this constitutes clear and convincing evidence that A.W. has been in the temporary custody of FCDJFS for more than 12 months of a consecutive 22-month period. Moreover, each time she was removed from appellant's care, A.W. was placed in the care of the same foster home.

{¶ 18} Finally, in consideration of R.C. 2151.414(D)(1)(d), the juvenile court found the

evidence made it clear that the child was in need of a legally secure placement. In so holding, the juvenile court noted appellant's almost immediate regression after twice completing the required case plan, as well as her apparent inability to maintain financial stability. The juvenile court also noted that no biological father has ever been determined for A.W., and that no suitable relative has indicated a desire to take custody of the child. Based on these findings, the juvenile court determined that it was in A.W.'s best interest to grant permanent custody to FCDJFS.

{¶ 19} After carefully reviewing the record in this case, we find no error in the trial court's decision finding it was in A.W.'s best interest to grant permanent custody to FCDJFS. Appellant, however, raises several issues arguing the juvenile court's decision was not in the child's best interest. For instance, appellant initially argues the juvenile court improperly found A.W. exhibited separation anxiety because that finding was not supported by any medical testimony. However, even without medical testimony, the record firmly establishes that A.W. exhibited signs of stress upon being removed from both her mother and her foster family. In fact, as A.W.'s foster mother testified in regards to A.W.'s alleged separation anxiety:

> [GUARDIAN AD LITEM]: In the last return to you did [A.W.] show any stress from these removals and returns?
>
> [FOSTER MOTHER]: Yeah, she's starting to be afraid of the dark, that was new, she wasn't afraid of the dark before. Her separation anxiety when you would leave her room, and she had to know where I was at all times to the point to where if I went to go take a bath, she had to be in there sitting in the floor playing with something to know where I was.
>
> [GUARDIAN AD LITEM]: Does she still suffer from any of those anxieties?
>
> [FOSTER MOTHER]: Somewhat yeah. She doesn't she just has to know where I'm going, where I don't leave her much just because of that, but like at daycare she's becoming comfortable with that again the whole routine of being in daycare and

knowing that I'll be back to get her. But she still suffers somewhat from that.

Appellant also testified regarding A.W.'s alleged separation anxiety:

[APPELLANT'S TRIAL COUNSEL]: And we've heard testimony from the foster mom that there was concerns that your daughter exhibiting, had separation anxiety needing to know [w]here the foster mom is at all times, is it also a behavior that occurred where she was with you?

[APPELLANT]: Yes ma'am.

[APPELLANT'S TRIAL COUNSEL]: During the times that she was placed back with you or prior to even being removed?

[APPELLANT]: After she was removed the first time she always had to know where I was going. If I went to the restroom she was there, bath, right there.

{¶ 20} The fact that the child showed signs of stress when removed from both her mother and foster family, regardless of whether those signs could be medically diagnosed as separation anxiety, is certainly a relevant consideration the court may take into account when determining whether permanent custody is appropriate. To hold otherwise would place an unnecessary evidentiary burden on children service agencies when dealing with the already difficult nature of permanent custody proceedings. Therefore, as the juvenile court's finding was supported by sufficient credible evidence, appellant's first argument is overruled.

{¶ 21} Next, appellant argues the juvenile court's decision was improper because it ignored the bond between A.W. and appellant. However, contrary to appellant's claim otherwise, the juvenile court specifically noted A.W. had a bond with her mother, but that the child actually had a "stronger bond" with her foster family. Although not explicit, this finding was supported by the record and witness testimony that indicated A.W. consistently referred to her foster family's residence as "home," and that she called her foster parents "mommy" and "daddy" and her foster sister "sissy." Specifically, as A.W.'s foster mother testified:

[FOSTER MOTHER]: She's a little spoiled. Great, she actually

just started calling my daughter sissy. And she's just like a big sister to her. And then my husband once again, a little spoiled, but he, he loves her and she loves him. It's taken awhile for her to develop that relationship with him in the beginning she was really afraid of men in general. I'm not sure why but it's taken awhile but they're fine now.

[FCDJFS]: How, how long would you say that things have been fine? Is that just since the last time she's been in your home or [?]

[FOSTER MOTHER]: No the sec[ond], well when she first came it was hard but after a few months she grew to get used to him now that she's around him more she's, the past year or so they've really bonded.

[FCDJFS]: What kind of things do they do together?

[FOSTER MOTHER]: Playing outside, walks, bicycle trips, he has a carrier on the back of his bicycle that when she was smaller she rode in. Going to the [park], watching TV shows together just any of those…

[FCDJFS]: Is it your desire to continue to have [A.W.] in your home?

[FOSTER MOTHER]: As long as she needs, yep.

There was also testimony elicited from A.W.'s foster mother that she and her husband were interested in adopting A.W. if permanent custody was granted to FCDJFS. Although A.W. had made a bond with appellant, because the juvenile court's finding the child actually had a "stronger bond" with her foster family was supported by sufficient credible evidence, appellant's second argument is overruled.

{¶ 22} Appellant also argues the juvenile court's decision was improper because she was able to complete the case plan and regain custody of A.W. on two separate occasions. While this may be true, the record demonstrates that on both occasions appellant was later found under the influence of drugs or alcohol and in a state where she was unable to properly care for her daughter. In addition, the record indicates appellant had left her daughter in the care of R.W., who she had a protection order against, and who was recently

- 10 -

charged with OVI wherein a firearm was located in his car. Appellant even acknowledged that A.W. was not to be around R.W. during this time. The record also indicates that when A.W. was last removed from appellant's care, instead of appearing at FCDJFS offices as promised, appellant left the state with her mother and did not return until approximately two weeks later.

{¶ 23} As this court has stated previously, "a parent is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re A.M.L.*, 12th Dist. Butler No. CA2013-01-010, 2013-Ohio-2277, ¶ 32, quoting *In re L.M.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 50. Although appellant may be able to work within the confines of her case plan, the record clearly indicates that she is incapable of taking care of her child on a consistent basis. In other words, while it appears that appellant had once again taken steps towards recovery and compliance, given her almost immediate regression whenever she was reunited with her daughter, we find such progress is simply too little, too late. Appellant's third argument is therefore overruled.

{¶ 24} Next, appellant argues the juvenile court's decision was improper because there was no credible evidence she was under the influence of drugs or alcohol, thus twice prompting FCDJFS to remove A.W. from her care. However, the record contains ample evidence indicating appellant was under the influence of some foreign substance on both occasions. Here, the record indicates when FCDJFS made an unannounced visit to her home on October 3, 2012, appellant did not answer the door for approximately 15 minutes, during which time FCDJFS reported that A.W. attempted to open the door and could be heard crying inside. Once appellant answered the door, the record indicates she exhibited dilated eyes, was stuttering and slurring her words, and contradicted herself. Appellant later admitted to mixing the drugs Xanax and Suboxone, a medication prescribed to combat her prior heroin addition, contrary to her doctor's orders. In addition, after police arrived at R.W.'s

home to conduct a wellness check on October 2, 2013, appellant failed a field sobriety test after she appeared unsteady on her feet and exhibited slurred speech. This evidence was certainly sufficient credible evidence to establish her intoxicated state. Appellant's fourth argument is overruled.

{¶ 25} Finally, Appellant argues the juvenile court's decision was improper because there was no credible evidence that she was unable to maintain financial stability. Yet, due to her apparent medical conditions, the record indicates appellant has only been able to secure seasonal employment through her mother's gardening shop. As appellant readily admits, she does not receive a paystub from her mother, nor does she receive a set salary. Rather, appellant only receives money from her mother "as needed." This includes money for insurance and gas for her car, her electric bill, and her cell phone. The record also contains evidence that appellant lives in housing subsidized by the Department of Housing and Urban Development (HUD), that she receives $189 in food stamps per month, and has accepted additional financial assistance from R.W. and from a friend named "Mark." Although appellant refers to this merely as her "support system," we find this arrangement falls well short of the financial stability necessary to raise a child. Appellant's fifth argument is therefore overruled.

{¶ 26} As FCDJFS states as part of its appellate brief, A.W. is entitled to not only periods of appropriate care, but an entire childhood where her needs are consistently being met. Appellant has failed to demonstrate that she can provide her daughter with such care. Moreover, while appellant asserts that greater weight should be given to appellant's bond with her daughter, compliance with her case plan, and steps towards remedying the situations that lead to A.W.'s removal from her care, we find the juvenile court properly considered the appropriate factors under R.C. 2151.414(D)(1) and acted in the child's best interest by granting permanent custody to FCDJFS. Therefore, having found no merit to any

of the five arguments advanced by appellant herein, appellant's single assignment of error is overruled.

{¶ 27} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.