[Cite as *In re J.C.*, 2018-Ohio-1687.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | |
| | | CASE NO. CA2017-11-015 |
| J.C. | : | |
| | | O P I N I O N |
| | : | 4/30/2018 |
| | : | |

APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2014-3065

Zachary A. Corbin, Brown County Prosecuting Attorney, Mary McMullen, Suite 2, 510 East State Street, Georgetown, Ohio 45121, for appellee Brown County Department of Job and Family Services

Dever Law Firm, Scott A. Hoberg, 9146 Cincinnati Columbus Road, West Chester, Ohio 45069, for appellant T.C.

Julie Steddom, 111 West Cherry Street, Georgetown, Ohio 45121, guardian ad litem

**S. POWELL, P.J.**

{¶ 1} Appellant, T.C., appeals from the decision of the Brown County Court of Common Pleas, Juvenile Division, granting permanent custody of his daughter, J.C., to appellee, Brown County Department of Job and Family Services ("BCDJFS"). For the reasons outlined below, we affirm.

{¶ 2} T.C. is the biological father of the child at issue, J.C., a girl, born on December

4, 2013. The child's biological mother is not a party to this appeal.

{¶ 3} On May 28, 2014, BCDJFS moved the juvenile court for an emergency ex parte order alleging J.C. was an abused and dependent child. In support of this motion, BCDJFS notified the juvenile court that it received a report that J.C.'s paternal aunt had dropped the child off at T.C.'s residence, but that T.C. left "when the aunt came to the residence due to verbal confrontation." BCDJFS also notified the juvenile court that because there was nobody to care for J.C., the child had been left with a neighbor overnight. BCDJFS further notified the juvenile court that it had since located T.C., who expressed his desire to now care for J.C., but that T.C. admitted he would be unable to pass a drug screen for "pills, THC, and other things." The juvenile court granted BCJDFS's motion and J.C. was placed in the care of BCDJFS. The juvenile court then appointed J.C. with a guardian ad litem.

{¶ 4} On June 2, 2014, BCDJFS filed a complaint alleging J.C. was a dependent child as defined by R.C. 2151.04(B). Pursuant to that statute, a "dependent child" is any child "[w]ho lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian[.]" The allegation of dependency was based on the same claims BCDJFS raised as part of its motion for an emergency ex parte order. After holding a hearing on the matter, the juvenile court granted temporary custody of J.C. to BCDJFS. The juvenile court determined there was probable cause to believe J.C.'s placement in a foster home was necessary to prevent immediate or threatened physical or emotional harm. Two days later, on June 4, 2014, BCDJFS placed J.C. with a foster-to-adopt family, a placement that has gone unchanged ever since.

{¶ 5} On July 15, 2014, following an adjudication hearing, the juvenile court issued an entry adjudicating J.C. a dependent child. Thereafter, on September 29, 2014, after holding a dispositional hearing, the juvenile court issued an entry ordering J.C. remain in

the temporary custody of BCDJFS. A case plan was then established that required T.C. to complete case management services to obtain, maintain, and provide a safe, stable, and suitable home environment for J.C. T.C. was also ordered to successfully complete parenting classes, a drug and alcohol assessment, and outpatient drug treatment, thus subjecting him to random drug screens.

{¶ 6} On November 24, 2014, the juvenile court determined it was in J.C.'s best interest to remain in the temporary custody of BCDJFS. Several months later, on May 13, 2015, BCJDFS moved for a six-month extension of the juvenile court's temporary custody order. The following week, on May 21, 2015, a juvenile court magistrate issued a decision finding the parties had agreed to extend BCDJFS's temporary custody for an additional six months. In issuing this decision, the magistrate found T.C. had tested negative on all his drug screens. However, as it relates to his involvement in parenting classes, the magistrate determined T.C. had only obtained a certificate of attendance, not a certificate of completion, due to the "difference of opinions" between T.C. and his counselor, Dr. A. Eugene Smiley.

{¶ 7} On August 7, 2015, the guardian ad litem filed a report with the juvenile court noting her concerns regarding T.C.'s ability to properly care for his daughter, including, among others, his truthfulness and his "failure to participate in any kind of relapse prevention that involves drug screens." As a result, the guardian ad litem recommended T.C. be "actively engaged in relapse prevention with an approved provider." The guardian ad litem further recommended that T.C. undergo a psychological evaluation prior to any increase in his visitation time with J.C.

{¶ 8} On August 12, 2015, Dr. Smiley filed a report with the juvenile court listing the numerous concerns he had regarding T.C., including T.C.'s untreated mental health issues and "significant history of drug abuse and general instability relative to life choices,

relationships, etc." Dr. Smiley further noted that T.C. exhibited an inability and unwillingness to consider any guidance, direction, and/or training that was outside of his personal beliefs and view of the world. This includes claims that T.C. "didn't feel a need to continue drug rehabilitation since he had been delivered from his addiction by Jesus Christ." According to Dr. Smiley, due to the significant nature of these issues, it would be beneficial for T.C. "to undergo a comprehensive psychological evaluation to determine where he is relative to emotional and functional stability sufficient to handle the stresses and issues related to parenting such a young child." That same day, BCDJFS also filed a report with the juvenile court indicating it, too, had concerns regarding T.C.'s mental health.

{¶ 9} On August 13, 2015, after holding a hearing on the matter, a juvenile court magistrate issued a decision noting that both the guardian ad litem and BCDJFS had requested T.C. complete a psychological evaluation. The magistrate further noted that BCDJFS had expressed its intentions to file an amended case plan to modify T.C.'s visitation time from unsupervised time to supervised time, as well as a motion for permanent custody.[1] The case plan was later amended to include BCDJFS's request for T.C. to complete a psychological evaluation. T.C. never objected to this addition to his case plan.

{¶ 10} On November 30, 2015, BCDJFS moved for permanent custody of J.C. A two-day trial was then conducted before a juvenile court magistrate that, after being continued in progress, ultimately concluded on March 22, 2016. During trial, the magistrate heard testimony from, among others, Dr. Smiley and T.C. The magistrate was also presented with the guardian ad litem's final report and recommendations.

{¶ 11} On September 2, 2016, the magistrate issued a decision finding it was in

---

1. It should be noted, the record indicates BCDJFS requested T.C.'s parenting time be modified after it was reported he "often brings other people with him during his visitation with the child. The agency reports that the people that come with [T.C]. are substance abusers."

J.C.'s best interest to grant BCDJFS's motion for permanent custody. In so holding, the magistrate stated the following:

> [T.C.] has engaged in case plan services; however, he has not successfully completed parenting education classes. He has not completed a psychological evaluation. He has not participated in substance abuse treatment. [T.C.] may have continued to test negative for illegal substances through his case; however, [T.C.] has not gained any insight or knowledge to his substance abuse problem. He has absolutely no idea why he used drugs, or what are his triggers. He has no plan for relapse prevention. BCDJFS offered [T.C.] services to help remedy the condition that caused removal.

Concluding, the magistrate determined that "the child cannot be placed with either parent within a reasonable time," and that, "[t]he parents have not remedied the conditions that caused the removal of the child from the home."

{¶ 12} On September 16, 2016, T.C. filed an objection to the magistrate's decision. As part of his objection, T.C. requested the juvenile court appoint him with new counsel to review the magistrate's decision "and the appropriateness of appointed counsel." On September 23, 2016, the magistrate issued a decision permitting T.C.'s trial counsel to withdraw and T.C. was appointed with new counsel. The juvenile court then issued a scheduling order outlining the brief schedule regarding T.C.'s objection to the magistrate's decision. It is undisputed that both T.C. and BCDJFS complied with the juvenile court's scheduling order by timely filing briefs outlining their respective positions with the juvenile court.

{¶ 13} On April 13, 2017, while T.C.'s objection to the magistrate's decision was still pending, the juvenile court held a permanent custody review hearing. Following this hearing, the juvenile court issued a decision finding J.C. was "doing well in her placement and meeting all milestones." The juvenile court further found that T.C. had since "stopped communicating with the agency. The child's behavior has improved, which appears to be

the result of [T.C.'s] diminished contact." Another permanent custody review hearing was then held on October 10, 2017, following which a juvenile court magistrate found J.C. was "doing well in her placement," whereas T.C. "was not cooperative with the Agency and visitation has terminated."

{¶ 14} On November 2, 2017, the juvenile court issued a decision overruling T.C.'s objection to the magistrate's decision. In so holding, the juvenile court determined that while T.C. had not failed any drug screens, he had not successfully completed a substance abuse treatment program as recommended by BCDJFS, a decision the juvenile court found "shortsighted." The juvenile court further determined that T.C. had not successfully completed his parenting classes, thus prompting the juvenile court to state, in pertinent part, the following:

> [T.C.] indicates the he did not successfully complete parenting education because he and Dr. Smiley, the facilitator of the Parenting Education Classes, had theological differences. Testimony revealed that [T.C] was unwilling to consider some of the parenting techniques offered. Testimony from Dr. Smiley indicates that [T.C.] was unwilling to ascertain any knowledge from the class. [T.C.] did attend every class but was unwilling to learn any of the parent techniques offered. [T.C.] was more concerned with finding error in the classes.

{¶ 15} T.C. now appeals from the juvenile court's decision granting permanent custody of J.C. to BCDJFS, raising the following single assignment of error for review.

{¶ 16} IN A CHILD CUSTODY CASE, THE TRIAL COURT ERRED IN ITS DECISION AND ORDER GRANTING PERMANENT CUSTODY OF THE CHILD TO THE AGENCY DESPITE THE MANIFEST WEIGHT OF THE EVIDENCE THAT FATHER HAD REMEDIED THE SITUATION THAT BROUGHT THE CHILD INTO CARE.

{¶ 17} In his single assignment of error, T.C. argues the juvenile court's decision to grant permanent custody to BCDJFS was against the manifest weight of the evidence since "[t]he manifest weight of the evidence indicates that reunification with [him] was the proper

outcome of the permanent custody trial."  We disagree.

{¶ 18} Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met.  *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).  An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination.  *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.  In turn, this court will reverse a juvenile court's decision only if there is a sufficient conflict in the evidence presented.  *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10.  However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence."  *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 19} In determining whether a lower court's decision is against the manifest weight of the evidence, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases.  *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.  Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."  *Eastley* at ¶ 21.

{¶ 20} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met for the second prong of the permanent custody test to be satisfied. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶ 21} In this case, the juvenile court found J.C. had been in the temporary custody of BCDJFS for more than 12 months of a consecutive 22-month period as of the date BCDJFS moved for permanent custody, J.C. having been in the temporary custody of BCDJFS since June 2, 2014. T.C. does not dispute this finding, a finding which we note is supported by the record. Instead, T.C. argues the juvenile court's decision finding it was in J.C.'s best interest to grant permanent custody to BCDJFS was against the manifest weight of the evidence. After a thorough review of the record, we find the juvenile court's decision was in J.C's best interest, and therefore, not against the manifest weight of the evidence.

{¶ 22} When considering the best interest of a child in a permanent custody hearing,

the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors, including, but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶ 23} With respect to J.C.'s relevant interactions and interrelationships with those who may significantly affect her young life, the record indicates T.C. loves J.C. and engages appropriately with her during his weekly supervised visitation time. The record also indicates J.C. knows who T.C. is and is "very happy to see him." Nevertheless, when T.C.'s supervised visitation time is over, the record indicates J.C. is "fine. She's happy and ready to go." This is markedly different from when J.C. is leaving her foster family to visit with T.C., during which the record indicates J.C. has a "tantrum," "cries and becomes upset." The record further indicates J.C. is strongly bonded to her foster parents, who she refers to as her mother and father, having resided with them since she was just six months old. J.C.'s foster parents have expressed their willingness to adopt J.C. should permanent custody be granted to BCDJFS.

{¶ 24} Next, in regard to J.C.'s wishes, the juvenile court did not state J.C.'s wishes, likely due to her young age. The guardian ad litem, however, believed that it was in J.C.'s best interest to grant permanent custody to BCDJFS. Specifically, as the guardian ad litem stated in her report and recommendations, J.C. "appears very comfortable and happy in the foster home." The guardian ad litem further noted that J.C.'s foster family has provided

her with the only, secure, stable, and loving environment she has ever known. Thus, according to the guardian ad litem, J.C. "has no other options than permanent custody to [BCDJFS]."

{¶ 25} Regarding J.C.'s custodial history, as noted above, the juvenile court found J.C. had been in the continuous temporary custody of BCDJFS since June 2, 2014, well over 12 months of a consecutive 22-month period as of the date BCDJFS moved for permanent custody. T.C. does not dispute this finding.

{¶ 26} With respect to J.C.'s need for a legally secured permanent placement, the record indicates J.C. needed permanency after having been in the temporary custody of BCDJFS since June 2, 2014, well over 12 months of a consecutive 22-month period, something which she has now achieved through her placement with her foster family. The record further indicates that J.C.'s foster parents have expressed their willingness to adopt J.C. into their home where she has resided since she was just six months old. T.C., on the other hand, has not successfully completed many aspects of his case plan services, including parenting education classes, substance abuse treatment, or a psychological evaluation.

{¶ 27} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the record indicates these factors did not apply to the case at bar.

{¶ 28} As noted above, T.C. argues "[t]he manifest weight of the evidence indicates that reunification with [him] was the proper outcome of the permanent custody trial." In support, although acknowledging that he did not complete many aspects of his case plan services, T.C. nevertheless claims he was able to remedy his situation through "services he obtained on his own accord;" namely, "faith-based outreach services" as opposed to the "rudimentary aftercare services referred by the agency." However, while we commend T.C. for turning towards faith to maintain his sobriety, we disagree with T.C.'s claim that the

manifest weight of the evidence indicates the juvenile court's decision to grant BCDJFS permanent custody was improper, particularly when considering the significant issues T.C. has yet to resolve, most notably his admittedly untreated mental health issues.

{¶ 29} Contrary to T.C.'s claim otherwise, adhering to the recommended case plan services in a permanent custody case is not an elementary exercise equivalent to "checking off a box." Rather, these services are recommended as part of an overall plan to better the lives of all parties involved, parents and children alike. Faith can certainly play a part in this process. However, when dealing with the life of a young child, such as the case here, the juvenile court cannot, and should not, blindly accept one's claims of self-healing without some type of verification. In other words, if alternative treatment is used in lieu of the recommended case plan services, such treatment must be proven to have been effective through, at the very least, a comprehensive psychological evaluation.

{¶ 30} Except for a string of negative drug screens, T.C. has offered no proof to substantiate his claim that he has been "cured" of his prior drug addiction and mental health issues through his newfound religious devotion. In turn, due to the uncertain nature of T.C.'s rehabilitation, which we note is still in its early stages, the juvenile court's decision to grant permanent custody to BCDJFS was proper. This is particularly true here when considering J.C., who is now just four years old, has been fully integrated into life with her foster parents in her foster home. Therefore, after a full and thorough review of the record, we find no error in the juvenile court's decision granting permanent custody to BCDJFS. Accordingly, because we find no error in the juvenile court's decision, T.C.'s sole assignment of error is without merit and overruled.

{¶ 31} Judgment affirmed.

RINGLAND and M. POWELL, JJ., concur.