[Cite as *In re C.T.L.V.*, 2023-Ohio-1182.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| C.T.L.V. | : | CASE NO. CA2022-12-122 |
| | : | O P I N I O N<br>4/10/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2021-0115

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee, Butler County Department of Job and Family Services.

Michele Temmel, for appellee, father.

Mark Raines, for appellant.

Legal Aid Society of Southwest Ohio, LLC., and Jamie Lee Landvatter, guardian ad litem.

**PIPER, J.**

{¶1} Appellant, Mother, appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter, C.T.L.V., to the Butler County Department of Job and Family Services ("BCDJFS"). The child's Father did not

appeal.[1]  For the reasons detailed below, we affirm.

## Preliminary Background

{¶2}   C.T.L.V. is a female child born on August 20, 2013.  Mother and Father are immigrants from Guatemala and C.T.L.V. was not born in the United States.  The record further indicates Mother and Father also have two other children.

{¶3}   While the reasons for doing so are disputed, Father, at some point, moved to Ohio taking C.T.L.V. with him.  Mother claims that Father took C.T.L.V. without her permission and that Father would not allow her to communicate with C.T.L.V.  At the time of the permanent custody hearing, Mother acknowledged that she had not seen C.T.L.V. in person for five years.

{¶4}   C.T.L.V. had significant cognitive delays which have improved, but still exist in varying degrees.  The foster mother stated that when first arriving in her care, C.T.L.V. had the cognitive ability of an approximately one-and-one-half-year-old child, despite being seven years old.  Furthermore, foster mother stated that when C.T.L.V. first arrived, she was remarkably nonverbal.  Throughout these proceedings, C.T.L.V. has become more verbal with an increasing ability to communicate in both English and Spanish.

## Initial Proceedings Upon Removal

{¶5}   On April 16, 2021, BCDJFS refiled an abuse, neglect, and dependency complaint regarding C.T.L.V. seeking temporary custody.[2]  In the refiled complaint, BCDJFS alleged that on October 12, 2020, the Hamilton Police Department conducted a police removal of C.T.L.V. after she was left for an indeterminate period of time unattended in a vehicle at Miami Valley Gaming.

---

1. Father also did not appear at the permanent custody hearing.

2. BCDJFS filed a previous complaint which is not contained in the record thereby providing incomplete information as to why the complaint was refiled.

{¶6} The same day she was removed, C.T.L.V. was admitted to the Cincinnati Children's Hospital. Hospital staff discovered that C.T.L.V. had internal injuries to her vagina, which indicated sexual abuse. Hospital staff also discovered "male DNA" on C.T.L.V.'s body. BCDJFS stated there was an ongoing criminal investigation and it had received allegations that C.T.L.V.'s father was the alleged perpetrator of the possible sexual abuse.[3]

{¶7} According to the refiled complaint, Father had not enrolled C.T.L.V. in school despite the child having reached the age of seven in October 2020. The refiled complaint further indicated that Mother's whereabouts was not initially known but that she had since been located in Homestead, Florida. The refiled complaint then indicated that a home study request had been submitted to the state of Florida under the Interstate Compact for the Placement of Children ("ICPC").

{¶8} Following a hearing, the juvenile court granted an emergency ex parte order granting temporary custody to BCDJFS. The juvenile court then ordered that Father have no contact with C.T.L.V. Mother's contact with the child was to occur at the discretion of BCDJFS.

{¶9} The ICPC home study stated that Mother did not have appropriate housing, as the home was in a deplorable condition with mold "everywhere." There was only one full size bed in the residence where Mother and her two other children would sleep. Mother reportedly stated that she would be moving soon and would notify the "primary worker" after she moved.

{¶10} On May 11, 2021, the juvenile court held a hearing on the refiled complaint.

---

3. Subsequently, at the permanent custody hearing, the caseworker testified that no charges had been filed to date. It her was understanding there was still an open investigation. Father denied ever sexually abusing C.T.L.V.

BCDJFS moved to amend the refiled complaint to withdraw the abuse allegations. BCDJFS noted that a case plan was filed in November 2020 under the original case number and requested the juvenile court adopt the case plan for these proceedings. BCDJFS further requested that Mother be added to the case plan. Thereafter, Mother and Father agreed to the adjudication that C.T.L.V. was a dependent and neglected child.[4] The juvenile court then found C.T.L.V. to be neglected and dependent, and adopted the prior case plan with Mother now included. The case plan included requirements that Mother attain appropriate housing, gain employment, and submit to another home study. The juvenile court further stated that visitation between C.T.L.V. and Mother would begin once it was recommended by C.T.L.V.'s therapist.

{¶11} On August 19, 2021, the juvenile court held a review hearing during which Mother's counsel discussed the difficulties Mother was having in obtaining assistance in order to contact C.T.L.V.

{¶12} The guardian ad litem ("GAL") stated C.T.L.V.'s therapist had concerns about reintegrating the parents into C.T.L.V.'s current situation. C.T.L.V. had not been receiving consistent care and had the speech skills of a three-and-one-half-year-old child. However, the juvenile court agreed there should be some communication between C.T.L.V. and her parents. The juvenile court issued an order in an effort to facilitate communication with the child, stating:

> The BCDJFS shall advise this child's therapist that her mother and father both desire to have some communication with [C.T.L.V.]. Her therapist shall be advised that movement towards some communication, which can be structured, limited, or arranged in any way deemed to be necessary to keep [C.T.L.V.] comfortable needs to occur as soon as may be practicable.

---

4. Mother attended the court proceedings by phone. She only appeared in person for the permanent custody hearing.

{¶13} However, Mother only sporadically contacted the caseworker and as a result only had two video calls with C.T.L.V.

### Subsequent Permanent Custody Determination

{¶14} On January 12, 2022, BCDJFS moved for permanent custody. The permanent custody hearing was held on August 2, 2022. At the permanent custody hearing, the juvenile court heard testimony from Mother, C.T.L.V.'s foster mother, the BCDJFS caseworker, and C.T.L.V.'s therapist. The GAL also provided a report recommending permanent custody be granted to BCDJFS.

{¶15} Mother testified that she previously lived in Florida with Father and all three children. Mother stated that Father was abusive and would hit her, sometimes after he had been drinking but also while he was sober. According to Mother, Father left Florida with C.T.L.V. without her permission. Mother stated that she arrived home one day and Father and C.T.L.V. were gone. Mother testified that she did not file a missing persons report. Mother explained that although she was aware she could have called the police, she did not contact the police because she was afraid Father would retaliate against her. Mother took no steps to locate C.T.L.V. or retrieve her from Father. Although Mother thought Father would take care of C.T.L.V., Mother also acknowledged that she had concerns that Father might do "something" to C.T.L.V.

{¶16} Mother admitted that she failed the first home study due to the poor conditions of her living arrangements. Mother also admitted to failing a second home study because she failed to report that her boyfriend was living in the residence. Mother testified that she was employed full time at a plant nursery. Mother stated that she had another family member who provided care for her two other children while she worked.

{¶17} The caseworker stated that Mother's engagement throughout these proceedings was erratic. Furthermore, Mother had not seen C.T.L.V. for years. The

caseworker testified that Mother only had two video calls with C.T.L.V. The caseworker did not observe the first video call but noted the second video call only lasted approximately 15 to 20 minutes. The caseworker stated that during the call C.T.L.V. appeared very anxious and clung to her foster mother. The caseworker stated that as the video call progressed C.T.L.V. appeared excited to see her siblings despite indicating that she did not remember them.

{¶18} The caseworker explained that it would be very difficult for Mother to reestablish a relationship with C.T.L.V. due to the lengthy period of time apart from her. The caseworker also confirmed that Mother failed two home studies. The caseworker further addressed other concerns. For example, C.T.L.V. is on an IEP and was scheduled to be placed in a resource room for the next school year.[5] C.T.L.V. has been diagnosed with PTSD and is in ongoing speech therapy, occupational therapy, and play therapy. The caseworker stated that Mother would not know how to meet C.T.L.V.'s special needs.

{¶19} The caseworker testified that C.T.L.V. is thriving with her foster family. C.T.L.V. was initially an extremely fearful child who tended to hide under tables, but has made significant strides and is now happier and appears more comfortable. The caseworker stated that C.T.L.V. has bonded with her foster family and that the foster family is able to meet C.T.L.V.'s special needs.

{¶20} C.T.L.V.'s foster mother testified that C.T.L.V. has remained in her care since October 2020. When foster mother first met C.T.L.V. in the hospital, C.T.L.V. was very small, malnourished, and had notable dark circles under her eyes. According to the foster mother, C.T.L.V. was basically nonverbal. While C.T.L.V. can now use full sentences, she still struggles to communicate. Foster mother was able to enroll C.T.L.V. in school. Initially,

---

5. An Individualized Educational Plan designed for the specific needs of a particular child is known as an IEP.

C.T.L.V. was placed on a 504 plan for her protection.[6]  C.T.L.V. had to repeat the second grade.  However, at the time of the permanent custody hearing, C.T.L.V. had been promoted to the third grade and was on an IEP.  Foster mother testified that C.T.L.V. has dramatically improved and was thriving.

**{¶21}** C.T.L.V.'s foster mother also testified about the video calls between C.T.L.V. and Mother.  Foster mother testified that C.T.L.V. was very nervous during the calls and C.T.L.V. clung to the foster mother.  Foster mother also testified that during the first video call, Mother and C.T.L.V. mostly just waved at each other.  During the second video call, the foster mother stated that C.T.L.V. was calmer, but there was limited engagement during the call.  Foster mother explained "there was a lot of waving initially."  Foster mother stated that the second video call only lasted approximately 10 to 15 minutes.

**{¶22}** C.T.L.V.'s foster mother indicated that she wanted to adopt C.T.L.V. and that C.T.L.V. is very bonded to her daughters.  Foster mother has five daughters, one of whom was also adopted and was originally from C.T.L.V.'s home country of Guatemala.

**{¶23}** Next, the state called C.T.L.V.'s therapist, Adriana Blazer, as a witness. Blazer testified that she had been working with C.T.L.V. for over a year.  Blazer explained that she has not been able to start trauma therapy with C.T.L.V. since C.T.L.V. could not fully express her feelings due to poor language skills.  When she began treating C.T.L.V., Blazer stated that C.T.L.V. was very anxious and nonverbal.  As therapy progressed, Blazer stated that she had observed C.T.L.V.'s improvements in regard to her ability to comprehend and her use of language. Blazer indicated that C.T.L.V. seems happy with her foster home and has a positive relationship with her foster mother.

---

6. The foster mother testified that the 504 plan was in place for C.T.L.V.'s protection because the goal at the time was to get her socialized in school.  The foster mother explained that the focus was not on academics at that point, but rather to help C.T.L.V. adapt to being in school and capable of interacting with others.

{¶24} The GAL's report noted an additional observation regarding an in-person visit Mother had with C.T.L.V. The GAL observed that the visit lasted approximately one hour at a local park. When C.T.L.V. saw Mother, C.T.L.V. reportedly began to cry. C.T.L.V. clung to her foster mother and indicated that she wanted to return to her foster home. The visit ended because Mother tried to hug C.T.L.V. and C.T.L.V. began crying again. The GAL's report concluded that permanent custody should be granted to BCDJFS.

{¶25} On August 31, 2022, the magistrate issued an entry granting BCDJFS's motion for permanent custody. Mother filed objections to the magistrate's decision. Mother argued that the termination of her parental rights was not in C.T.L.V.'s best interest. Mother believes she is a fit custodial parent. Mother claims that she was prevented from visiting C.T.L.V., and was not given a genuine opportunity for reunification. On November 22, 2022, the juvenile court overruled Mother's objections and adopted the magistrate's decision. Mother timely appeals, raising a single assignment of error for review.

## Issue on Appeal

{¶26} Mother's sole assignment of error is as follows:

{¶27} THE TRIAL COURT'S DECISION TO GRANT BUTLER COUNTY CHILDREN'S SERVICES PERMANENT CUSTODY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶28} In her sole assignment of error, Mother argues the juvenile court's decision is not supported by clear and convincing evidence.[7] Mother argues the juvenile court and BCDJFS prevented her from repairing her relationship with C.T.L.V. Mother maintains that neither the juvenile court nor BCDJFS made any meaningful efforts to repair her relationship

---

7. In the "issue presented for review," Mother selectively addresses only a few of the best interest factors to be considered. However, there are additional factors that must be considered when determining a child's best interest in permanent custody matters.

with C.T.L.V. to determine if Mother could be a "good option for the child." She further argues the court hindered C.T.L.V.'s ability to have meaningful contact with her biological sisters. Consequently, Mother requests this court remand the case to the juvenile court with orders for a plan to transition C.T.L.V. back into Mother's care.

**Standard of Review**

{¶29} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 748, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *Id.*

{¶30} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-094 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15.

**Relevant Statutory Law**

{¶31} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of the above findings must be applicable for the second part of the permanent custody test to be satisfied. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶32} In this case, C.T.L.V. has been in the temporary custody of BCDJFS for more than 12 months of a consecutive 22-month period at the time BCDJFS filed its motion for permanent custody. This satisfies the second part of the test. Therefore, we now must consider the first part of the test which involves the best interest factors. *Id.*

{¶33} When considering the best interest of a child in a permanent custody hearing, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. This includes, but is not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any

other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

**Analysis**

{¶34} In granting the motion for permanent custody, the juvenile court considered each of the best interest factors in light of the evidence presented at the hearing. With respect to R.C. 2151.414(D)(1)(a), the juvenile court stated C.T.L.V. had been in her Father's care at the time of the police removal. Approximately three years prior to C.T.L.V.'s removal, Father had taken her to Ohio leaving Mother and C.T.L.V.'s two other siblings behind. The juvenile court noted there were differing accounts concerning Father's motivations for leaving with C.T.L.V. However, Mother admitted that she knew Father had taken C.T.L.V. to Ohio. She acknowledged that she took no action to try to find C.T.L.V. Mother further admitted that she had not seen C.T.L.V. in person in five years.

{¶35} When Mother was located, her home study failed because of the poor condition of her residence with mold "everywhere" and there being only one bed in which she and her two other children slept. A second home study was conducted later, which also failed because Mother misled the assessors regarding another adult, Mother's boyfriend, residing in the home.

{¶36} The juvenile court noted that C.T.L.V. did not have any contact with Father since the police removal. Due to concerns regarding her medical condition, including allegations that C.T.L.V. had been sexually abused, Father was ordered to have no contact

with C.T.L.V. Father participated minimally with his case plan services.[8] The juvenile court further noted that there were concerns about Father's excessive alcohol use and having multiple men present or living in his residence.

{¶37} The juvenile court stated that efforts were made to facilitate video calls between C.T.L.V. and Mother. Given C.T.L.V.'s age, speech limitations, and the time of separation, the virtual contact was limited and, as the juvenile court described, "superficial." The only time Mother travelled to Ohio was for the permanent custody hearing. It was at that time that Mother had the opportunity to visit C.T.L.V. in person. The juvenile court noted that during the visit C.T.L.V. had time to warm up to Mother, but that effort failed, and the visit was not productive.

{¶38} C.T.L.V. is doing well in her foster home, which she calls her home. At the time of police removal, C.T.L.V. was nonverbal. Foster mother speaks Spanish and spent the night with C.T.L.V. in the hospital and began to forge their relationship. When C.T.L.V. came into foster care, she was malnourished and prone to anger. While C.T.L.V. still suffers delays, she is described by foster mother as being confident, loving, observant, and empathetic. The foster family has incorporated C.T.L.V. into their home and family. Foster mother expressed interest in adopting C.T.L.V. if presented the opportunity.

{¶39} In its consideration of R.C. 2151.414(D)(1)(b), the juvenile court indicated that C.T.L.V. had not been interviewed. The GAL submitted a report recommending permanent custody be granted to BCDJFS.

{¶40} With respect to R.C. 2151.414(D)(1)(c), the juvenile court reviewed the custodial history of C.T.L.V. The juvenile court found C.T.L.V. has been in the temporary

---

8. During a hearing, Father's counsel indicated that the transportation service provided for him was routinely late, contributing to him missing appointments. Later, the assistant prosecutor noted that Father lived only four or five blocks from where the appointments took place.

custody of BCDJFS for 12 or more months of a consecutive 22-month period.

{¶41} In considering R.C. 2151.414(D)(1)(d), the juvenile court found C.T.L.V. is in need of a legally secure placement and such placement is the only way C.T.L.V.'s needs can be achieved. C.T.L.V.'s Father has been absent from C.T.L.V.'s life since she was removed from his care in October 2020. C.T.L.V.'s Mother did nothing when Father took C.T.L.V. to Ohio and was without contact with her for many years. When Mother was located in Florida, she was found to be residing in a home in a deplorable condition and had to relocate. However, upon relocating, Mother failed a second home study because she was dishonest with the home study assessor regarding who resided in the home.

{¶42} Meanwhile, C.T.L.V. has thrived in her foster placement and is having her special needs met. The juvenile court noted that C.T.L.V. considers her foster family to be her family. The record reflects that C.T.L.V. is well-cared for and bonded with her foster family.

{¶43} Finally, with respect to R.C. 2151.414(D)(1)(e), the juvenile court found that both Mother and Father abandoned C.T.L.V. Again, the juvenile court stated that Father has had no contact with C.T.L.V. and has done little to rectify the situation. Even accepting Mother's explanation that Father wrongfully took C.T.L.V. away, she did nothing to retrieve her.

{¶44} Based on these findings, the juvenile court found by clear and convincing evidence that it was in the C.T.L.V.'s best interest to grant permanent custody to BCDJFS. On appeal, Mother claims the juvenile court and BCDJFS prevented her from repairing her relationship with C.T.L.V. and hindered C.T.L.V.'s ability to have meaningful contact with her siblings. She argues that "BCDJFS certainly did not show enough to prove by clear and convincing evidence that this relationship couldn't be repaired."

{¶45} We have carefully and thoroughly reviewed the evidence in this case and find

that the juvenile court's determination regarding the best interest of C.T.L.V. is supported by clear and convincing evidence and was not against the manifest weight of the evidence. Though Mother states that she is employed, has suitable housing, and manages to take care of her other children, the record reflects that she cannot provide the continued care and attention that C.T.L.V. needs. Even accepting Mother's claim that Father wrongfully took C.T.L.V. without her knowledge, she failed to do anything over the ensuing years to protect or even maintain contact with C.T.L.V. Mother admitted that she failed to act out of concern for her own well-being. Mother further admitted that she was concerned that Father might do something to C.T.L.V., yet still failed to act. Mother's concern was well-founded, as C.T.L.V. was never enrolled in school and was possibly sexually abused while in Father's care.

{¶46} Mother complains that the juvenile court and BCDJFS did not do more to expand the relationship between herself and C.T.L.V. She further maintains "the court" hindered C.T.L.V.'s ability to have meaningful contact with her other siblings. Yet this argument ignores the reality of the situation. Mother had already abandoned C.T.L.V. and had not seen her for years before C.T.L.V. was removed from Father's care. Even under different circumstances, it would have been difficult to reestablish a meaningful relationship with C.T.L.V. It was even more complicated in this case due to C.T.L.V.'s cognitive delays and limited communication skills. Although Mother, on a few occasions, indicated that she wanted to communicate with C.T.L.V., the juvenile court had to weigh the competing circumstances.

{¶47} C.T.L.V. had a limited ability to communicate, had experienced childhood trauma, and had been abandoned by her parents. Mother was also sporadic in her communication with the caseworker and never appeared in Ohio to see C.T.L.V. until the permanent custody hearing. In light of this, the juvenile court made efforts to arrange for

communication between Mother and C.T.L.V., which were conducted through video calls. Though Mother complains that the juvenile court or BCDJFS should have done more, this situation was Mother's own doing. She did nothing when Father left for Ohio with C.T.L.V. and made no efforts to locate C.T.L.V. in order to check on her well-being. Even after having failed her first home study, Mother failed a second home study because she was not completely honest with the home study assessors.

## Conclusion

{¶48} While in the temporary custody of BCDJFS, C.T.L.V. has thrived and received treatment for her medical conditions and cognitive delays. C.T.L.V. is bonded with her foster family and the foster mother has expressed an interest in providing a stable, safe environment in which C.T.L.V. can continue to thrive. In light of the foregoing, we find there is sufficient, credible evidence – which was also clear and convincing – supporting the juvenile court's decision. We further find the juvenile court as the factfinder did not lose its way, nor create a manifest miscarriage of justice requiring reversal. There was no error in the juvenile court's decision to grant permanent custody to BCDJFS. Mother's sole assignment of error is overruled.

{¶49} Judgment affirmed.

HENDRICKSON, P.J., and BYRNE, J., concur.