[Cite as *In re V.R.R.*, 2023-Ohio-185.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NO. CA2022-08-079 |
| V.R.R. | : | |
| | : | O P I N I O N<br>1/23/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2019-0213

Garrett Law Offices, and Dawn S. Garrett, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Willa Concannon, Assistant Prosecuting Attorney, for appellant.

Jeannine Barbeau, guardian ad litem.

**PIPER, J.**

{¶1}   Appellant-Father appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of his three-year-old daughter "Verity"[1] to Butler County Department of Jobs and Family Services, Children Services

---

1. For privacy and readability, we refer to the child using this pseudonym.

Division ("Agency"). For the following reasons, we affirm the decision of the juvenile court.

## I. Facts and Procedural History

{¶2} When Verity was born, in late April 2019, she tested positive for cocaine and marijuana. Both Mother and Father admitted using drugs. Around the same time, it was discovered that Father had disciplined Verity's 8-year-old half-sister (same mother) with a belt and left extensive bruising on her back and buttocks. He was charged with child endangering and ultimately convicted of disorderly conduct.

{¶3} The Agency quickly removed both girls and initially placed them with their maternal grandmother and step-grandfather. A couple months later, the girls were adjudicated abused and dependent children. In July, the Agency discovered substantiated allegations that the step-grandfather had sexually abused Mother when she was a child. The girls were then placed in the same foster home. Verity's sister had to be removed because of her serious psychiatric problems, and after cycling through foster homes, she ended up in an institutional setting. Verity, though, stayed with the foster family and has been there ever since.

{¶4} A case plan was developed for the family with the goal of reunification, and a guardian ad litem ("GAL") was appointed for the children. Father and Mother were granted highly supervised "level 1" visits at a visitation center with Verity and her sister. The juvenile court gave the Agency the authority to liberalize visitation, if appropriate, without seeking further court approval. But for quite a while this was simply not possible because of both parents' ongoing drug use. It was not until early 2021 that Mother stopped using and not until May 2021 that Father stopped using cocaine, though he continued to use marijuana until September. That same September, a visitation specialist at the center recommended liberalizing visitation one step to "level 2." The Agency had concerns and did not immediately follow the recommendation. But after Father filed a motion for less restrictive

visits in early November, the Agency agreed to raise the visitation level. Father filed another motion for liberalized visitation late in December. The visitation specialist had not recommended further liberalization, and the Agency refused to allow visits that were any less supervised.

{¶5} The Agency had moved for permanent custody of both children in November 2020. In December 2021, a permanent custody hearing began before a magistrate. The hearing took several days and was spread over several months, ending in March 2022.

{¶6} Among the witnesses were caseworker Jamie Shope, therapeutic services coordinator Kamyra Sweeten, and visitation specialist Lynel Anderson. Shope testified that Verity was very happy with her foster family. She noted that the sister had been hospitalized at least four times for suicidal or homicidal ideation and was in a locked-down, residential treatment facility. Shope and Sweeten were both very concerned about Father's and Mother's willingness to protect the girls from their step-grandfather, even with a court order prohibiting contact. Both parents, they said, were unconcerned and dismissed the step-grandfather's abuse as something that happened a long time ago. Before the hearing, Father had never been opposed to the girls visiting their step-grandfather. And Mother was still close to step-grandfather, having had him give her away at her wedding a month or so before the hearing. Shope testified that Mother had told her twice that step-grandfather had sexually abused her as a child, but later denied it or said that "it was 30 years ago and it didn't matter."

{¶7} Regarding Father's and Mother's visits with the girls, Shope, Sweeten, and Anderson all described them as very chaotic. Neither parent could properly care for the girls during the highly supervised two-hour visits, even with guidance from multiple professionals. Anderson testified that Father and Mother never really seemed to understand why their children were removed. Sweeten and Anderson had to explain to

them "over and over again" why their visitation remained so closely supervised—that, for example, they would scream at each other while Verity's sister had temper tantrums; that Father was decidedly unreceptive to Sweeten's suggestions about how he could engage with the girls; that Father and Mother laughed at Verity's sister's speech impediment; that during visits the parents were unable to engage with the children; and that Father and Mother struggled even to change Verity's diaper and dress her. The visits improved a little about two years after removal, when the parents visited with Verity alone, after her sister was placed in a facility. But even then, the visits were rough, and Father and Mother still failed to understand Verity's developmental needs. The "level 2" visits still required staff supervision the entire time and often staff intervention. Even by the end of the permanent-custody hearing, no increase in visitation level had been recommended.

{¶8} Regarding the parents' home, during a visit a month before the hearing, Shope observed stairs that were dangerously steep for Verity which had no baby gate. The home was cluttered with debris in every room to the point that it was hard to find a path through—this despite Shope having had multiple conversations with the parents about cleaning up. Sweeten too observed that the home was cluttered and littered with dirty dishes.

{¶9} Verity's foster mother also testified. She said that Verity lived with her, her husband, and their four children, whom Verity called her brothers and sisters. The foster mother said that she and her husband "have every intention of adopting [Verity] if that's where things go." "[H]onestly," she continued, "I couldn't imagine her not a part of our family at this point."

{¶10} Father agreed that Verity was doing very well with her foster family. He testified that, just before the hearing, he and Mother had been married. Father admitted his drug use and his abuse of Verity's sister, which he attributed to the drugs and the stress in

- 4 -

dealing with her psychological issues. Father said that he had been smoking marijuana for 27 years and using cocaine daily for about four years. But he said that he had not used cocaine since May 2021 and had not used marijuana since September 2021. Regarding visitation, Father agreed that the caseworker and visitation specialist helped him prepare for visits and often assisted during visits. Even after taking parenting classes, Father said, he struggled during visits because he "couldn't get how they wanted, wanted us to work with a one year old and a nine year old." Father referred to the step-grandfather's abuse of Mother as "false rumors." He had no concerns about the grandparents babysitting the girls. Said Father: "I'm outside of the family. I don't know what happened thirty years ago so therefore why should I [care]."

{¶11} Mother testified that she wanted Verity and her sister to have contact with their grandparents. Mother said that she maintained a close relationship with both grandparents and did not believe that the step-grandfather presented any danger at all. She claimed that as a child she had lied about the step-grandfather's sexual abuse.

{¶12} Near the end of the hearing, the GAL submitted a written report. In it, she stated that she had visited Verity in the foster home and agreed with the foster mother that she was a "happy, delightful child" who has "strong bonds" with foster family. The GAL noted that Verity had never lived with Father or Mother and had none of the serious issues that her sister had. Both parents had failed to remedy the reasons for the children's removal, noted the GAL, despite having had three years to do so. The GAL wrote that visits with the parents had rarely gone well and that they required "interventions by workers to keep the children safe." The GAL noted that Father had a longstanding drug habit and that he continued to test positive for cocaine and marijuana up until a few months before the hearing began. The GAL's visit to the parents' home at the time of the hearing revealed that it was "quite dirty, disorganized, and cluttered with trash and debris throughout. The

floors and surfaces in all the rooms were covered." But perhaps the biggest concern that the GAL had was the parents' failure to recognize the threat posed by the step-grandfather, and she worried that the children were at risk if they were returned to Father and Mother. It was the GAL's belief that returning the girls to the parents posed a "significant risk to their physical and mental health."

{¶13} The magistrate entered a decision in April 2022 recommending that the juvenile court terminate parental rights and grant the Agency permanent custody of Verity. The magistrate recommended just the opposite for Verity's sister, in a separate decision. It was undisputed, said the magistrate, that Verity was healthy, well-adjusted, and happy, and that she was thriving with her foster family. What stood out to the magistrate was Verity's relationship with her foster family—a relationship that was mostly formed when Mother and Father were unavailable to care for her because of their drug use. Verity had been with the foster family for around 18 months before Mother stopped using drugs and around 21 months before Father stopped using. She had been out of Father's and Mother's care for her entire young life and had never really been with them outside the highly supervised visits. By then, said the magistrate, Verity had spent well over three-quarters of her nascent life with the foster family, and Father and Mother were just ready to begin the process of reunification. The magistrate found that Verity "consider[ed] her foster home to be her home and her foster family to be her family" and that she was fully incorporated into their home and into their family. And the foster parents wanted to make that incorporation permanent by adopting her.

{¶14} Both Father and Mother filed objections to the magistrate's decision. On August 22, 2022, after a hearing, the juvenile court overruled all their objections and adopted the magistrate's decision.

{¶15} Father appealed.[2]

## II. Analysis

{¶16} Father presents two assignments of error. Because the issues raised are closely related, we address them together.

{¶17} Assignment of Error No. 1:

{¶18} THE AGENCY FAILED TO MAKE REASONABLE EFFORTS BY DENYING LIBERALIZED VISITS WHICH DENIAL PRECLUDED PARENTS FROM PROGRESSING TO REUNIFICATION.

{¶19} Assignment of Error No. 2:

{¶20} THE TRIAL COURT'S DECISION TO GRANT THE AGENCY PERMANENT CUSTODY OF THE CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶21} Father first alleges that the juvenile court erred by finding that the Agency made reasonable efforts to reunify the family. He contends that the Agency should have permitted liberalized visitation. Father next alleges that the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. He again raises the issue of liberalized visitation and further contends that some of the best interest factors weighed in favor of denying the Agency's motion.

{¶22} The right to parent one's children is a fundamental right. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054 (2000); *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). To protect this right, Ohio law requires that, before parental rights are terminated, the state must demonstrate that it has made reasonable efforts to reunify the family. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43. In addition, the state is required to prove by clear

---

2 Mother did not appeal. We note too that this appeal concerns only Verity.

and convincing evidence that the statutory standards for permanent custody have been satisfied. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982).

## A. Reasonable Efforts to Reunify

{¶23} R.C. 2151.419 requires a juvenile court, before it terminates parental rights, to determine whether reasonable efforts have been made to reunify the family, which the children services agency has the burden of proving. R.C. 2151.419(A)(1). Father contends that the Agency failed to satisfy its duty to make reasonable efforts to reunite Verity with her family. He argues that a major reason for granting permanent custody to the Agency was the strength of Verity's bond with her foster family compared to her bond with him. Permitting more liberalized visits with her, says Father, would have strengthened her bond with him and facilitated reunification.

{¶24} As an initial matter, the juvenile court has made reasonable efforts determinations in these proceedings before. And if a court has previously made the determination, it need not do so during the final permanent custody hearing. *In re C.F.* at ¶ 43. The juvenile court here made a reasonable efforts determination at least twice before, at hearings on April 24, 2019, and December 23, 2020. Father did not object to either of those determinations. But because the possibility of more liberalized visits did not arise until a couple of months before the permanent custody hearing began, after the previous determinations, we construe Father's argument to be, in essence, that the Agency's subsequent denial of liberalized visits meant that it could no longer be said to have made reasonable efforts to reunify the family.

{¶25} "'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." (Citation omitted.) *In re K.L.*, 12th Dist. Clermont No. CA2012-08-062, 2013-Ohio-12, ¶ 18. "In determining whether the agency made

- 8 -

reasonable efforts * * *, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." (Citation omitted.) *Id.*

{¶26} Here, Father began closely supervised base-level visits with Verity shortly after she was born. For quite a while the visits could not be liberalized because Father and Mother continued to use drugs. It was not until roughly two months before the final permanent custody hearing began that Father finally stopped using drugs, and it was then that liberalized visits were recommended. While the Agency did not immediately adopt this recommendation, it was not required to. The Agency did not liberalize visitation any further, though, nor was further liberalization recommend, because, as the evidence showed, Father and Mother were struggling to provide basic care for the child.

{¶27} The magistrate was very clear in his decision that the visitation level did not play a major role (if any role at all) in the permanent custody decision. Regardless, liberalized visitation at the end of the permanent custody proceedings would not have materially changed the situation. The possibility of less supervision came at the end of a very long road. By that time, Verity had already been with her foster family for most of her life. As the magistrate said, liberalized visits at that late stage would not have made an appreciable difference to the strength of the bond between Father and Verity. And it would not have changed the strong bond that she had with her foster parents.

{¶28} Ultimately, it was Father's conduct that caused him to miss the opportunity to develop a bond with his daughter. He simply did not progress quickly enough to the point that he could have more independent visits with her.

### B. The Child's Best Interest

{¶29} Father also challenges the juvenile court's decision to terminate his parental rights and grant permanent custody to the Agency. He incorporates his argument from the

first assignment of error, that the Agency failed to allow liberalized visits. Father also argues that granting permanent custody to the Agency was not necessary to attain a secure permanent placement for Verity because he and Mother have completed all their case plan services and remedied the conditions that caused her removal in the first place. In addition, Father points out that permanent custody of Verity's sister was denied during the same proceedings.

{¶30} R.C. 2151.414 governs a motion for permanent custody of a child and sets forth specific determinations that a juvenile court must make before granting it. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 22. As relevant here, the court must determine, by clear and convincing evidence, first, that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and, second, that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1). "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶31} In this case, the juvenile court determined that the condition in R.C. 2151.414(B)(1)(d) applied: Verity had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period. Father does not dispute this determination. His challenge is to the court's determination that granting the Agency permanent custody was in Verity's best interest.

{¶32} In determining a child's best interest, a court must consider "all relevant factors," including these five: the child's relationship with people like his or her parents, siblings, relatives, and foster parents; the child's wishes (if the child is of sufficient age and maturity); the child's custodial history; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of

- 10 -

permanent custody to the agency; and whether any factor listed in R.C. 2151.414(E)(7) to (11) applies. R.C. 2151.414(D)(1). No one best interest factor inherently carries any "greater weight or heightened significance" than another. *In re C.F.* at ¶ 57.

{¶33} An appellate court's review of a permanent custody decision is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination that clear and convincing evidence—evidence from which a firm conviction or belief can be formed—showed that permanent custody is in child's best interest. *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 22. But we have also said that a judgment may be reversed as against the manifest weight of the evidence if there is sufficient conflict in the evidence, that is, if after weighing the evidence and all reasonable inferences and considering the credibility of witnesses, we conclude that the juvenile court, in resolving the conflicts, clearly lost its way in finding that permanent custody is in the child's best interest. *Id.* Here, after reviewing the entire record, we conclude that sufficient credible evidence existed to support the juvenile court's determination that granting permanent custody to the Agency was in Verity's best interest. And there was no conflict in the evidence sufficient to suggest that the juvenile court's judgment was against the weight of the evidence.

{¶34} The magistrate (and it may be assumed, the juvenile court) considered and weighed all the relevant best interest factors. The magistrate did find that a legally secure permanent placement for Verity could possibly be achieved, someday, eventually, without granting permanent custody to the Agency. But the magistrate also found that three-year-old Verity had been living with her foster family for almost her whole life, and that she had come to see them as her family. She was thriving and happy with the foster family, and the family wanted to adopt her. Verity had never been with Father outside highly supervised visits, and she lacked any real bond with him. For her, then, reunification with Father would

require removing her from the only home that she has ever known, taking her away from the people who have loved her and cared for her as long as she can remember, and giving her to people who are all but strangers.

{¶35} Father's argument puts great stock in the fact that he completed his case plan services. But "a parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification, as the case plan is simply a means to a goal, but not the goal itself." *In re A.R.*, 12th Dist. Butler No. CA2015-08-143, 2016-Ohio-4919, ¶ 18; *see also In re N.L.,* 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35 (stating that "substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"). "[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has *substantially remedied* the concerns that caused the child's removal from the parent's custody." (Emphasis sic.) *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, 'it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.'" *In re J.M.*, 4th Dist. Highland No. 21CA13, 2021-Ohio-4146, ¶ 60, quoting *In re Gomer*, 3d Dist. Wyandot Nos. 16-03-19, 16-03-20, and 16-03-21, 2004-Ohio-1723, ¶ 36. Consequently, even if Father had completed his entire case plan, it would not necessarily mean that placing Verity in his custody would serve her best interest.

{¶36} There is evidence here that even toward the end of the proceedings, Father was unable to care for Verity on the most fundamental level. At supervised visits he struggled with such basic tasks as changing her diaper and dressing her, and he consistently failed to recognize her developmental needs. His apartment was filthy and there were conditions that made it unsafe for a young child. Also, if Verity were placed with

Father, she would return to living with Mother, whose fitness to care for the child was questioned by the magistrate. It was likely that Mother would be the primary caregiver while Father is working.

{¶37} Father also contends that the decision to deny permanent custody as to Verity's sister undermines the decision to grant permanent custody as to Verity. But the situation of her sister is easily distinguished. Unlike Verity—who has never lived with Father or Mother, is healthy, and has been thriving with her foster family for nearly three years— the sister had very serious mental health issues, had cycled through multiple foster homes, and was in an institutional lockdown setting at the time of the permanent custody hearing. Moreover, the sister was 11 years old, had lived with Mother for eight years, and had expressed a desire to return to Mother. In sum, the sister's circumstances are quite unlike Verity's.

{¶38} We recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e United States Supreme] Court.'" *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. at 65, 120 S.Ct. 2054. But "[t]he fundamental interest of parents is not absolute * * *. Once the case reaches the disposition phase, the best interest of the child controls." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 11. '"[T]he natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App.1974). And a child's best interest is "served by being placed in a permanent situation that fosters growth, stability, and security." *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 69.

{¶39} In this case, Father's effort to rectify his past mistakes must be commended,

and his love for his daughter is not doubted. But the focus must be on what is best for the child. The evidence supports the juvenile court's determination that what is best for Verity was granting permanent custody to the Agency.

### III. Conclusion

**{¶40}** The two assignments of error presented are overruled. The juvenile court's judgment is affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.