[Cite as *In re K.K.*, 2023-Ohio-400.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

IN RE: :

    K.K., et al. :    CASE NOS. CA2020-12-130
                                                CA2021-01-002
                          :                  CA2021-01-003

                          :           O P I N I O N
                                       2/13/2023

                          :

                          :

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2018-0380, JN2018-0381, & JN2018-0435

Jeanine C. Barbeau, for appellant, Mother.

Dawn S. Garrett, for appellant, Father.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

    **PIPER, P.J.**

    {¶1} This matter is before us on remand from the Ohio Supreme Court pursuant to *In re K.K.*, Slip Opinion No. 2022-Ohio-3888, for consideration of issues not previously ruled on by this court in the appeal of a decision by the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody to the Butler County Department of Job and Family Services ("BCDJFS").

    {¶2} There are three children involved in this case: (1) D.T., a girl born on October

20, 2014; (2) K.K., a girl born on January 4, 2017; and (3) M.K.III., a boy born on December 3, 2018. Appellants, A.T. ("Mother") and M.K. ("Father") are the biological parents of K.K. and M.K.III. The biological father of D.T. is N.B., who has not participated in these proceedings.

{¶3} Mother also has a legal husband who the state initially named as the children's father in the original complaints. Mother's legal husband participated in some of the proceedings below, but the juvenile court later issued orders disestablishing him as a biological father to any of the children.[1]

{¶4} On September 20, 2018, BCDJFS received a report alleging that D.T. and K.K. were residing in a home with deplorable conditions. On September 25, 2018, a caseworker was able to confirm the unsanitary and unsafe condition of the mobile home. The caseworker found the home had broken windows and holes in the floor, walls, ceiling, and roof. Parts of the ceiling had collapsed or been removed. The residence had exposed wiring, rodent nests, dog feces, and smelled of urine. D.T. and K.K. were found wearing only soiled diapers.

{¶5} That same day, Mother, Father, and Mother's legal husband signed voluntary custody agreements for the children, placing D.T. and K.K. in the temporary custody of the agency. Mother, Father, and Mother's legal husband agreed to seek clean, safe, and appropriate housing. The record shows that Mother and Father were unsuccessful in rehabilitating the condition of their home.

{¶6} On October 25, 2018, BCDJFS filed two complaints alleging D.T. and K.K.

---

1. Mother's legal husband was present in the home at the time D.T. and K.K. were removed. The record suggests that Mother's legal husband would sometimes reside in the same home as Mother and Father, but there were also periods where he resided elsewhere. However, he was not a party in the permanent custody proceedings and is not a party in this appeal.

were abused, neglected, and dependent children. In the complaints, the agency described the unsanitary and unsafe condition of the home and noted that the home remained in a deplorable condition. The complaint also stated that Mother and her legal husband had previously been involved with the agency regarding their older children who were removed due to similar circumstances. Following a hearing, the juvenile court issued an emergency ex parte order granting temporary custody of D.T. and K.K. to BCDJFS.

{¶7} On December 11, 2018, BCDJFS filed a complaint requesting temporary custody of M.K.III. alleging he was a dependent child. In the complaint, BCDJFS stated that Mother had given birth to M.K.III on December 3, 2018, and noted that Mother and Father were involved with the agency regarding D.T. and K.K. The complaint restated concerns the agency had with the condition of Mother and Father's home. The juvenile court issued an ex parte order granting temporary custody of M.K.III. to BCDJFS. M.K.III. was placed in the same foster family as D.T. and K.K.

{¶8} On March 19, 2019, the juvenile court held an adjudicatory and dispositional hearing on the complaints filed regarding D.T., K.K., and M.K.III. During the hearing, Mother and Father agreed that D.T. and K.K. were neglected and dependent. However, Mother and Father wanted to contest the complaint regarding M.K.III. The juvenile court adjudicated D.T. and K.K. neglected and dependent and issued a dispositional decision awarding temporary custody of D.T. and K.K. to BCDJFS.

{¶9} A case plan was adopted requiring Mother and Father to obtain and maintain stable employment and housing, complete an in-home parenting education program, establish cleaning routines, and submit to random drugs screens. Mother and Father were also required to successfully complete psychological evaluations and follow all recommendations.

{¶10} The juvenile court scheduled a contested adjudicatory hearing regarding M.K.III. for April 30, 2019. Mother and Father failed to appear. The court found Mother and Father in default and adjudicated M.K.III. a dependent child. The disposition was held on June 7, 2019, and the prior case plan was adopted as applicable to M.K.III.

{¶11} Following his psychological evaluation, Father was diagnosed with an intellectual disability (unspecified) and received a recommendation that he complete intensive parenting education. It was also recommended that Father receive services from the Department of Living Skills. The recommendation stated that parenting training should occur before, during, and after reunification.

{¶12} On February 12, 2020, BCDJFS moved for permanent custody of the three children. BCDJFS alleged that the children had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. The agency also alleged that "no further treatment plan can be formulated" and that the granting of permanent custody was in the children's best interest. The juvenile court held a hearing on the motion on September 29, 2020.

{¶13} The state presented the testimony of Paul Schuler, a caseworker for BCDJFS. Schuler investigated the original allegations regarding D.T. and K.K. and observed the deplorable condition of the home leading to the children's removal. Schuler testified that he worked with Mother and Father on their case plan from September 2018 until March 2020. Schuler explained that Mother and Father failed to make any progress with repairing the family's first residence. Mother and Father resided in their first residence from the time of the initial report in September 2018 until November 2018 when they moved in with another family across the street.

{¶14} In November 2019, Mother and Father moved into another mobile home in

the Applewood Point Trailer Park. Schuler inspected the mobile home once in November 2019 and attempted several more visits in December 2019 through February 2020. During the inspection, Schuler testified that the bedroom set aside for D.T. and K.K. had a "built in shelf" that he opined was not safe because it was "very haphazard" and did not appear to be secured to a wall. Schuler also observed that there was only one source of heat for the home, a space heater on the floor. Schuler stated that there was also no serviceable water in the home due to a burst pipe. Schuler further testified that the carpet was dirty and unsafe for a baby or young child to crawl on. Schuler testified that Mother and Father were never able to provide a safe, stable home for their children.

{¶15} Schuler testified that Mother and Father originally had unsupervised visitation with their children but that ended when they returned the children approximately one hour late. Mother and Father had supervised visits at the Family Healing Center from February 2019 until March 2020. The staff at the Family Healing Center reported a very strong body odor emanating primarily from Father and Mother's legal husband requiring the use of air freshener after the visits. During the visits, the children behaved well and appeared bonded. Father was bonded to K.K. Mother was bonded with K.K. and M.K.III but appeared to have a more difficult relationship with D.T., who Mother described as a "rape baby." Visitation was later suspended because the COVID-19 pandemic forced the Family Healing Center to close temporarily. Mother and Father transitioned to virtual visits facilitated by the Family Healing Center.

{¶16} Schuler testified that Mother and Father had engaged in counseling and psychiatric services. Mother and Father worked various jobs throughout the proceedings. Mother and Father completed the Department of Living Skills program, but instruction did not take place in their residence because of their continued housing issues.

{¶17} Schuler testified that the children improved while in their foster home and that the children are bonded with their foster parents. K.K. and D.T. had been in the foster family for two years. M.K.III. has resided with the same foster family for a similar length of time beginning shortly after his birth.

{¶18} Next, the state called Sydney Johnson, the current caseworker. Johnson stated that she began working on the family's case in March 2020. Johnson testified that Mother and Father were still living in the mobile home in the Applewood Point Trailer Park, and she was able to inspect it in September 2020. Johnson stated that the home did not have running water for approximately nine months and that Mother and Father were still in the process of fixing the residence. Mother and Father have a dog and a cat. Johnson testified that she noticed the odor of dog urine in the residence. Johnson also testified about several health and safety concerns with the mobile home. Johnson stated that the bedroom set aside for D.T. and K.K. had plywood floors and a bunk bed, which concerned her because the young children could fall out. Johnson further testified that she observed cockroaches in the home. Mother and Father acknowledged that they had been working to exterminate the cockroaches. Johnson observed cockroaches near the kitchen sink and dead cockroaches in the refrigerator. Johnson also testified that the bathtub was not secure and "kind of leans." Furthermore, the bedroom used by Mother and Father was cluttered and the floor was wet, the wet spot smelled like urine.

{¶19} Johnson testified that she had concerns about whether Mother and Father would be able to maintain the home. Johnson testified that Mother had substantially complied with some aspects of her case plan. Mother addressed her mental health, had income, and maintained a stable (albeit not clean or safe) residence. Johnson stated that the home was still unsafe and dirty. Johnson explained that Mother and Father had little

understanding and "[t]hey had no clue, like they are unable to know what they need to do, what they are supposed to do at almost two years into the case." They both required Johnson's assistance. Johnson testified that she was concerned with the cleanliness of the residence, as well as the collective ability of Mother and Father to keep themselves clean. She was also concerned about their ability to understand the dangers their residence posed to the children.

{¶20} The children's foster father testified that, at the time of the final hearing, D.T., K.K., and M.K.III. have been placed with him and his family for approximately two years. He testified about the children's home life and their progress since the placement. The foster father testified that the children are bonded with him, and his family, and he intended on adopting them if permanent custody were granted.

{¶21} Mother testified on her own behalf. Mother testified that she is currently employed in a position as security personnel, working third shift while Father is also employed working second shift. When asked if she would enroll D.T. in school, Mother testified that she would homeschool her. When asked how she would sleep if she had to homeschool D.T., watch the children while Father worked the second shift, and then do her job on third shift, Mother replied that she's "an insomniac." Mother acknowledged the agency's concerns with the home, such as having no furnace, "nasty" carpet, and cockroaches. However, she said that some of the issues had been corrected and downplayed other concerns. Mother testified that she has sought mental health treatment and is doing much better. Mother stated that, as she understood it, she had completed her case plan. Finally, Mother testified that she believed it was in the best interest of the children to be placed with her.

{¶22} Father testified that he loves his children and worked hard to get them back.

He stated that he is employed by a security company working from 3:30 p.m. until 10:00 p.m. Father testified that he has made safety plans for the children and created a daily schedule, including chore lists. Father testified that he believed that he bettered himself by participating in the classes associated with the case plan and believes it is in the children's best interest to be placed with him. Father also called Ronnie Langford, an instructor for Pathway to Fatherhood Services, who observed Father's participation in a fatherhood program and Jane Behari, an instructor for the Development of Living Skills program. Father also called one of his coworkers to testify on his behalf.

{¶23} After hearing the evidence, the magistrate found, by clear and convincing evidence, that it was in the children's best interest to grant permanent custody to BCDJFS. Mother and Father filed objections, which were overruled, and the juvenile court adopted the magistrate's decision. Mother and Father timely appealed the juvenile court's decision.

{¶24} On appeal, this court addressed Father's first assignment of error, which argued the juvenile court should have dismissed the agency's complaints once it failed to hold dispositional hearings within 90 days of the filing of the complaints. *In re K.K.*, 12th Dist. Butler Nos. CA2020-12-130, CA2021-01-002, and CA2021-01-003, 2021-Ohio-1689, ¶ 4. For reasons explained therein, this court agreed and reversed the judgments of the juvenile court granting permanent custody of D.T., K.K., and M.K.III. to the agency. *Id.* We declined to address the remaining assignments of error after concluding that Father's first assignment of error was dispositive of the appeal. *Id.*

{¶25} The agency appealed. The supreme court accepted the agency's appeal. This court also certified a conflict with another appellate district. The supreme court agreed a conflict existed and consolidated the certified-conflict case with the jurisdictional appeal. Following briefing and argument, the supreme court reversed this court's decision and

remanded the case to this court to address the remaining assignments of error. *In re K.K.*, Slip Opinion No. 2022-Ohio-3888, ¶ 63. We now consider the remaining three assignments of error.

{¶26} Mother's Sole Assignment of Error:

{¶27} THE TRIAL COURT'S DECISION AND ORDER GRANTING PERMANENT CUSTODY OF K.K., D.T. AND M.K. TO BUTLER COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IT WAS CONTRARY TO THE BEST INTERESTS OF THE CHILDREN, AND THERE WAS INSUFFICIENT CLEAR AND CONVINCING EVIDENCE TO SUPPORT THE DECISION.

{¶28} Father's Assignment of Error No. 2:

{¶29} APPELLANT WAS DENIED THE ABILITY AND REASONABLE OPPORTUNITY TO REUNIFY WITH HIS CHILDREN DUE TO THE PANDEMIC AND THE TIME FRAME TO COMPLETE HIS CASE PLAN AND REUNIFY SHOULD HAVE BEEN EXTENDED BY AN ADDITIONAL SIX MONTHS BEFORE PERMANENT CUSTODY WAS CONSIDERED.

{¶30} Father's Assignment of Error No. 3:

{¶31} THE GRANT OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶32} In her sole assignment of error, Mother argues the juvenile court's decision is against the manifest weight of the evidence, contrary to the best interests of the children, and unsupported by sufficient clear and convincing evidence. Father, in his second assignment of error, argues that he should have been provided with an additional six months before permanent custody was considered due to the COVID-19 pandemic. In his third assignment of error, Father argues the juvenile court's decision was against the

manifest weight of the evidence and not supported by sufficient evidence. Because these issues are interrelated, we will address them together.

**{¶33}** Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 748, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *Id.*

**{¶34}** In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-094 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15.

**{¶35}** Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a

two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of those findings must be met for the second prong of the permanent custody test to be satisfied. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶36} In this case, D.T., K.K., and M.K.III. have been in the temporary custody of BCDJFS for more than 12 months of a consecutive 22-month period at the time BCDJFS filed its motion for permanent custody. Therefore, we move to consideration of the best interest factors. *Id.*

{¶37} When considering the best interest of a child in a permanent custody hearing, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. This includes, but is not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the

child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶38} In granting the motion for permanent custody, the juvenile court considered each of the best interest factors in light of the evidence presented at the hearing. With respect to R.C. 2151.414(D)(1)(a), the juvenile court stated that K.K. and M.K.III. have a good relationship with Mother and Father. Mother and Father have maintained contact and have been appropriate and consistent in visitations. Mother's relationship with D.T. is complicated because Mother indicated D.T. was conceived as a result of a sexual offense. D.T. has a relationship with Mother's legal husband, who is not her biological father. Mother admits she has more work to do in her relationship with D.T., but states those efforts have been more difficult due to the constraints on visitation brought on by COVID-19 pandemic. Mother and Father have expressed their desire to have the children returned to their care.

{¶39} All three children have thrived in foster care. D.T. and K.K. have overcome hygiene issues that were present upon their removal from the home. All three children are active in home, family, and community activities. The children have been integrated into their foster family and the foster father testified he intended to adopt them if permanent custody were granted to the agency.

{¶40} In its consideration of R.C. 2151.414(D)(1)(b), the juvenile court indicated that, given the children's ages, they would not likely be able to comprehend the nature of the motion for permanent custody. The juvenile court acknowledged that the GAL recommended permanent custody be granted in favor of BCDJFS.

{¶41} With respect to R.C. 2151.414(D)(1)(c), the juvenile court reviewed the

custodial history of D.T., K.K., and M.K.III. The juvenile court found the children have been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period.

{¶42} In considering R.C. 2151.414(D)(1)(d), the juvenile court addressed the unsafe and unsanitary nature of Mother and Father's home from the inception of this case and the effect those conditions had upon the children. One consistent issue was the odor of the home and Father's notable body odor. This was the same issue which led to the removal of Mother's children in an earlier case.

{¶43} The juvenile court credited Mother and Father for substantially complying with case plan services and for maintaining regular contact with the children. The juvenile court stated that Mother's mental health had notably improved. The only portion of the case plan that was incomplete was parenting education that was to take place in Mother and Father's home.

{¶44} Although Mother and Father were compliant with other services, they failed to secure a safe and stable home throughout these proceedings. Mother and Father argued at the permanent custody hearing that they rectified the problems in the home, but there were concerns the home was not as clean and safe as Mother and Father alleged. Throughout the pendency of the case, Mother and Father's home continued to manifest the same problems that were apparent from the beginning of the case. The juvenile court found that Mother and Father's residence appears to be "at least facially * * * appropriate and stable." The juvenile court referenced photographs submitted by Mother and Father showing the difference from their residence in late 2018 to a time just prior to the final hearing. However, the juvenile court noted that other photographs taken by the caseworker showed the home was not quite as clean and clutter-free as Mother and Father's

photographs would suggest. The juvenile court was also skeptical of Mother and Father's claim about using up to five heating devices (space heaters and electric fireplaces) to warm the home, questioning the safety of that plan.

{¶45} The juvenile court balanced positive and negative factors. The juvenile court stated that Mother and Father appear to be relatively honest people, do not have a history of drug use or criminal activity, and have maintained serial (but not long term) employment. They have used online education to assist them in their efforts to maintain income. Their critical shortcoming, however, has to do with cleanliness, safety, and sanitation regarding themselves and their home. The juvenile court found that for nearly one-and-one-half years, before the COVID-19 pandemic, Mother and Father complied with case plan services, but made no progress towards addressing the root cause of the children's removal. The juvenile court concluded, based upon their history and Mother's history of having her children removed due to similar concerns that it was unlikely Mother and Father could provide a legally secure placement for the child even with ongoing monitoring, education, and services.

{¶46} Finally, with respect to R.C. 2151.414(D)(1)(e), the juvenile court found that none of the factors set forth apply to K.K. and M.K.III. The juvenile court, however, found that D.T.'s biological father had abandoned her.

{¶47} Based on these findings, the juvenile court found by clear and convincing evidence that it was in the children's best interest to grant permanent custody to BCDJFS. On appeal, Mother argues that she completed her case plan, has adequate income, and housing. She maintains that she is bonded with the children and sought to continue her relationship with them through regular visitations. Mother also states that BCDJFS presented insufficient credible evidence to support the award of permanent custody. Both

Father and Mother argue that the juvenile court's decision granting permanent custody was against the manifest weight of the evidence. Father also argues that he was denied the ability and opportunity to reunify with K.K. and M.K.III. due to the COVID-19 pandemic and that he should have been provided with an additional six months before the agency considered permanent custody. Father admits that he has no authority to support his argument. He further maintains that the condition of the family home has improved.

{¶48} As an initial matter, we find no merit to Father's claim that he should have been provided with an additional six months before the agency considered permanent custody in light of the COVID-19 pandemic. On appeal, Father argues that an extension of time should have been allowed to "permit the parents more time to prove that they have remedied the conditions and reunify with their children."

{¶49} However, Father never moved the juvenile court to extend temporary custody or continue the permanent custody proceedings on the grounds that the pandemic impeded his ability to remedy the condition of his home or to reunify with the children. Furthermore, when objecting to the magistrate's decision granting permanent custody to BCDJFS, Father did not raise the issue of a sixth-month extension. It is well settled that issues not raised in the trial court may not ordinarily be raised for the first time on appeal. *In re J.M.*, 12th Dist. Butler Nos. CA2021-06-072, CA2021-06-073, CA2021-07-083, and CA2021-07-084, 2021-Ohio-3961, ¶ 38. Where a party has failed to raise an issue in the trial court but subsequently raises it on appeal, an appellate court may consider the issue if it rises to the level of plain error. *Id.*

{¶50} Father cannot establish any error, plain or otherwise, when the juvenile court did not sua sponte grant a six-month continuance of the permanent custody proceedings. We agree with Father that there is no authority for his argument. Even if there were, the

facts in this case clearly do not warrant such an extension. In this case, the agency was alerted and became involved in the case in September 2018. Father had more than enough time to remedy the condition of his home and complete case plan services before the COVID-19 pandemic had even begun. Furthermore, it is unclear what specific items Father could accomplish with the remaining time. On appeal, he suggests "[t]he only remaining service for the parents to complete was not being offered specifically due to the pandemic." This is ostensibly a reference to the in-home parenting education program. However, the testimony shows that Mother and Father did not qualify for that program due to their inability to clean and maintain a safe home. Regardless, Mother and Father were provided sufficient opportunity to rectify the condition of their home, which they did not do. Finding no plain error, Father's argument with regard to a sua sponte continuance on the basis of COVID-19 is without merit.

{¶51} We have carefully and thoroughly reviewed the remaining arguments and the evidence in this case and find that the juvenile court's determination regarding the best interest of the children is supported by clear and convincing evidence and was not against the manifest weight of the evidence. Though Mother and Father have completed many of the case plan requirements, it is well established that the completion of case plan requirements does not preclude a grant of permanent custody. *In re Mraz*, 12th Dist. Brown Nos. CA2002-05-011 and CA2002-07-014, 2002-Ohio-7278, ¶ 13; *In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166, ¶ 35 ("[t]he case plan is merely a means to a goal and not a goal in itself"). The main concern is not whether a parent has successfully completed a case plan, but whether the parent has "substantially remedied the concerns that caused the removal from the parent's custody." *In re: V.R.R.*, 12th Dist. Butler No. CA2022-08-079, 2023-Ohio-185, ¶ 35. A juvenile court's primary focus in a permanent

custody proceeding is the child's best interest, therefore a parent could complete all of the case plan goals and the juvenile court could still appropriately terminate their parental rights. *Id.*

{¶52} In the present case, Mother and Father have been unable to show that they can provide their children with a clean and safe environment or provide for their basic needs. As this court has previously stated, parents are "afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re C.M.*, 12th Dist. Clermont No. CA2016-07-051, 2017-Ohio-57, ¶ 26. Mother and Father have been given ample opportunity to rectify their situation but have been unable or unwilling to correct the unsanitary and dangerous condition of their home. While the juvenile court credited Mother and Father with making some improvements to their home, the record supports a finding that these improvements are too little too late. Throughout the pendency of this case, the children have gotten older, have formed significant and nurturing bonds with their foster family, and have corrected the hygiene issues that were apparent upon their removal. Mother has previously lost custody of her older children due to similar hygiene and unsanitary home conditions yet failed to take sufficient action in this case.

{¶53} In light of the foregoing, we find the juvenile court's decision was supported by the evidence and find no error in the juvenile court's decision to grant permanent custody to BCDJFS. Mother's sole assignment of error and Father's second and third assignments of error are overruled.

{¶54} Judgment affirmed.

S. POWELL and HENDRICKSON, JJ., concur.